## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

I, Paul Bradley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been employed as a Special Agent since June 2017. I am assigned to the Tucson, Arizona office. I have completed the Homeland Security Investigations training program at Glynco, Georgia. At this institution, I have received specialized training including investigations of illegal alien, immigration, fraud, financial, cyber, import/export, and child pornography offenses; firearms, defensive tactics, surveillance, and undercover operations.

2.      Prior to becoming a Special Agent, I was employed by ICE Enforcement and Removal Operations as a Deportation Officer. I was also employed by the United States Border Patrol as a Border Patrol Agent. During my employment with these agencies, I have conducted investigations into criminal violations of the laws governing interstate commerce, illegal trafficking and importation of narcotics into the United States, and immigration offenses such as human smuggling. I received a Bachelor of Science in Criminal Justice degree from the University of New Haven in 2010, and a Master's of Science in National Security degree from the University of New Haven in 2012.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from witnesses, other special agents, law enforcement officers, documents, and open source and government databases. This affidavit contains the information necessary to support probable cause and does not contain every material fact that I have learned during the course of the investigation; however, no information known to me that would tend to negate probable cause has been withheld from this affidavit.

4.      This affidavit is made in support of an application under Federal Rule of Criminal Procedure 41 for a search and seizure warrant for the premises at 9134 E Calle Cascada, Tucson, AZ, 85715, as more specifically described in Attachment A (hereinafter the "Target Address"), for evidence, instrumentalities, contraband, and fruits of violations of 18 U.S.C. § 545, smuggling goods into the United States; 26 U.S.C. § 5861(d), possession of National Firearms Act (NFA) firearms not registered in the National Firearms Registration and Transfer Records (NFRTR); and 18 U.S.C. § 922(g)(1), possession of a firearm by a convicted felon.

## RELEVANT SECTIONS OF LAW

5.      As it pertains to this investigation, Title 18, United States Code, Section 545 states in part: "Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law shall be fined under this title or imprisoned not more than 20 years, or both."

6.      Title 26, United States Code, Section 5861(d) provides that "It shall be unlawful for any person…to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."

7.      The term "firearm" as applicable to Title 26, United States Code, Section 5861(d) is defined in Title 26, United States Code, Section 5845(a), to mean (1) a shotgun having a barrel or

barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

8. The term "silencer" as applicable to Title 26, United States Code, Section 5861(d) is defined in Title 26, United States Code, Section 5845(a)(7), to mean any silencer as defined in Title 18, United States Code, Section 921, which states the terms "firearm silencer" and "firearm muffler" are defined (in Subsection 921(a)(24)) as any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

9. Title 18, United States Code, Section 922(g)(1) provides that "It shall be unlawful for any person . . . previously convicted of a crime punishable by imprisonment for a term exceeding one year to possess a firearm." Section 921(a)(3)(C) defines the term firearm to include "any firearm muffler or firearm silencer."

10. The term "firearm" as applicable to Title 18, United States Code, Section 922(g)(1) is defined in Title 18, United States Code, Section 921(a)(3), as (A) any weapon (including a starter

gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. (This definition does not include antique firearms.)

11.     The term "firearm silencer" and "firearm muffler" as applicable to Title 18, United States Code, Section 922(g)(1) is defined in Title 18, United States Code, Section 921(a)(24) as any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

## BACKGROUND ON INLINE FILTERS AND SOLVENT TRAPS

12.     A solvent trap is a lawful device that attaches to the muzzle of a firearm barrel designed to catch or "trap" dirty cleaning solvent pushed through the barrel from the chamber end and out through the muzzle. Solvent traps are intended to prevent solvent from dripping, spraying, or spattering when pushed out the muzzle end of a firearm barrel. The front end cap of a solvent trap must be solid and have no hole that will allow a projectile to pass through (including pilot holes that can be widened to allow a projectile to pass through or marks indicating the location to drill such a hole). A device that has a hole in or indexing mark for a hole in the front end cap is classified as a "firearm silencer" under the National Firearms Act (NFA).

13.     According to information received from the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), including conversations with ATF agents and in review of the ATF Firearms & Ammunition Technology Division, Technical Bulletin 20-01 (Oct. 30, 2019), inline filters are distinctively different from spin-on filters. Spin-on filters have holes at both ends and are specifically designed to allow fluid to pass through the body of the device. Inline filters, as

regularly manufactured, advertised, and shipped to the United States by Chinese companies, are made without center holes, and constructed with no other permeable surface or permeable infrastructure which would allow fluid to filter through. As manufactured, inline filters do not contain any components that would retain or filter fine particulate matter. Moreover, these inline filters as shipped to do not contain any media, instructions, or manuals to allow the user to utilize these filters as advertised. Rather, as manufactured, inline filters are constructed similar to firearm silencers. Inline filters regularly discovered by Custom and Border Protection inspection officers contain solid metal interior components (which are similar to the baffles contained in a silencer to temper and quiet the noise coming out a barrel when a round is discharged).

14. In order to modify or redesign or remake an inline filter to a fully functioning silencer, one must drill holes in the center of the end caps and the solid metal interior components, thereby allowing a bullet to pass through unhindered. These filters, as shipped, contain solid endcaps and interior components that are marked or dimpled in the center, showing users where to drill a hole to allow the bullet to pass through. While instructions to modify the filters may not be included in the packaging, there are articles and videos on the internet that provide modification instructions. Below is an image from a silencer seized in this case, indicating the solid endcap with the dimple in the center.



## PROBABLE CAUSE

### INFORMATION RECEIVED ABOUT SUSPICIOUS PACKAGE

15.     Since approximately October 2019, HSI has been investigating the suspected unlawful importation of firearms and related controlled components into the United States, specifically such items originating from China. According to the ATF, there has recently been an influx of counterfeit and non-regulated silencers entering the U.S. via foreign sources. ATF has encountered these silencers and partnered with HSI and Customs and Border Protection (CBP) to combat the flow of these silencers into the U.S. Since this operation has commenced, there have been over 7,000 of these devices seized at U.S. Ports of Entry and during investigative controlled deliveries targeting individuals who receive such items contrary to law.

16.     In September 2021, HSI Tucson received information from the CBP National Targeting Center (NTC) that Eric MORENO, a resident of Tucson, Arizona, was the intended recipient of a package (the "Target Package") being shipped from China that was suspected to contain a silencer. The package was manifested as a "Spiral Single Core," which is commonly listed as a fuel filter. The package was addressed to "Eric Moreno" at the Target Address. HSI Tucson conducted criminal checks on MORENO and discovered that he has an extensive criminal history including multiple felony convictions. Further research confirmed that MORENO is a convicted felon who has not had his rights restored, and thereby is unable to legally possess a firearm. According to the Bureau of Industry and Security's Office of Exporter Services, Export Management and Compliance Division, MORENO does not have license to import or export firearms components.

### MORENO'S CRIMINAL HISTORY

17.     I reviewed police reports related to MORENO's previous arrests. MORENO has multiple arrests for firearms-related crimes, resulting in multiple felony convictions. In July 2000,

MORENO was arrested by Tucson Police Department (TPD) officers after being identified as the shooter in a drive-by shooting. This arrest resulted in felony convictions for Disorderly Conduct and Attempt to Discharge a Firearm at a Nonresidential Structure.

18. In November 2007, MORENO was arrested by TPD for Aggravated Assault, Burglary (1st degree), Misconduct Involving Weapons, and Kidnapping. This arrest was the result of MORENO forcing entry into a residence and demanding money for a debt while forcing a pistol into the victim's mouth. This arrest resulted in felony convictions for two counts of Aggravated Assault.

19. In August 2013, MORENO was arrested by TPD and charged with Possession of a Weapon by a Prohibited Person and Misconduct Involving Weapons after the execution of a warrant at his residence, resulting in the seizure of a stolen rifle, a pistol, firearm magazines, and ammunition. This arrest resulted in a felony conviction for Possession of a Deadly Weapon by a Prohibited Possessor.

20. In April 2016, MORENO was arrested by TPD and charged with Misconduct Involving Weapons after officers observed MORENO wearing a shoulder holster while executing an arrest warrant. Upon execution of a search warrant, MORENO was found in possession of the holster, containing loaded pistol magazines, and a loaded pistol. This arrest resulted in a felony conviction for Possession of a Deadly Weapon by a Prohibited Possessor.

21. In June 2019, MORENO was arrested by TPD and charged with Prohibited Weapon Manufacture/Possession/Sale and Possession/Use of Drug Paraphernalia after officers discovered MORENO asleep in a vehicle with syringes in his lap and a pistol in his waistband. This arrest resulted in a felony conviction for Possession of a Deadly Weapon by a Prohibited Possessor.

Case 4:21-mb-01885-BGM   Document 1-1   Filed 12/07/21   Page 8 of 18

21-01885MB

### RESEARCH ON 9134 E CALLE CASCADA, TUCSON, AZ, 85715

22. Utility checks for the Target Address show the account holder for the address is listed as "Eric Morel" with a social security number (SSN) ending in 5525, which is the same as MORENO's SSN. The phone number and email associated to the account are 520-551-0729 and Ericlm0121@gmail.com, respectively. Research in law enforcement databases link the phone number and email to MORENO. The emergency contact for the utilities is listed as the mother, Jacque Antar, with the phone number 520-245-6929. Antar was identified by the Tucson Police Department as MORENO's mother during his most recent arrest in June 2019. Based on available information, it is believed that MOREL is an alias for MORENO.

23. On October 19, 2021, I drove by the Target Address to check the address for any vehicles. I observed a white Nissan Titan pickup truck bearing Arizona license plate 9XA7BKA. Record checks on this vehicle show it is registered to Jacque Antar at 7868 S Castle Bay St, Tucson, AZ.

### SEIZURE OF THE PACKAGE ADDRESSED TO MORENO

24. On October 25, 2021, I contacted a Customs and Border Protections Officer (CBPO) at the Los Angeles International Mail Facility regarding the Target Package. The CBPO told me that the Target Package arrived and was inspected on October 25, 2021 and was found to contain two suppressors for a firearm. The Target Package was seized and turned over to HSI Torrance to be shipped to my attention via FedEx. I received the FedEx package on October 28, 2021. I opened the Fedex box and found one sealed evidence bag and a DHS Form 6051, which listed "N/A Suppressors" as the description of the contents.  While commonly referred to as a "suppressor," I know that the Gun Control Act of 1968 (GCA), Title 18, United States Code, Section 921(a)(24); and the National Firearms Act (NFA), Title 26, United States Code, Section 5845(a)(7); define

any device for silencing, muffling, or diminishing the report of a portable firearm as a firearm silencer or firearm muffler.

25. The Target Package was sealed inside of the evidence bag and contained green tape on the outside which stated, "Examined by U.S. Customs and Border Protection." The numbers 5510729 were listed in the phone number section on each of the external shipping labels. Absent the 520 area code, this is the same phone number listed for the utilities on the Target Address. Within the Target Package there were two smaller gray packages and one small padded yellow envelope. Each package contained separate shipping labels, all indicating MORENO as the addressee at the Target Address.

26. One of the gray packages was labeled with the barcode number LP00464328489140 and contained a black tube with an extra threaded ring ("Silencer 1"). The interior of Silencer 1 contained what appeared to be a monolithic baffle, which is a single piece of metal milled to create hollow chambers that trap and slow the release of gasses, and dampen the sound when a round of ammunition is fired. The end cap was not bored through, but there was a dimple in the center of the end cap. This dimple serves as a guide, showing the user where to drill a hole for the bullet to exit.

27. The other gray package was labeled with the barcode number LP00464302274168 and contained a silver-colored tube with a blue straw ("Silencer 2"). The interior of Silencer 2 contained multiple metal pieces that resembled a stacked baffle, which consists of interlocking pieces of metal that create hollow chambers when locked together within the silencer tube.

28. The interior pieces of Silencer 2 had dimples in the center. Similar to Silencer 1, these dimples on the interior components and end cap of Silencer 2 serve as a guide showing the user where to drill. In both Silencer 1 and Silencer 2, these dimples serve no purpose other than marking

the center of the interior component's endcaps to assist conversion to a completed silencer once the pieces are drilled through. As stated earlier, the mere presence of these dimples on Silencer 1 and Silencer 2 further causes them to be classified as firearm silencers and/or combinations of parts designed or redesigned and intended for use in assembling or fabricating a firearm silencer, per the NFA.

29. While Silencer 1 and Silencer 2 are constructed differently, the purpose of each device is the same. Silencers are typically constructed of a metal tube with interior metal sound dampening components, known as baffles, that are designed or milled to create a series of hollow chambers. The gas that is generated and propelled when the firearm is fired is redirected into these chambers, trapping the gasses, slowing its release through the muzzle and dampening the sound.

30. The yellow package was labeled with the barcode number LP00464101225969 and contained a black threaded cylinder, three screws, two O-rings, and one Allen key. These components are believed to be an adapter for attaching the silencers to the barrel of a gun (the "Silencer Adapter").

31. After examining the contents of the Target Package, I sealed them in a new evidence bag and secured them in the evidence room located at the HSI office in Tucson, Arizona. On November 8, 2021, I turned the sealed evidence bag over to ATF Special Agents. I was present when they opened the evidence bag and examined Silencer 1, Silencer 2, and the Silencer Adapter. During this examination of these components, the ATF Special Agents informed me that dimple on the end caps and interior silencer components serve no functional purpose and are placed as a guide for the user to drill a hole in the correct spot, thereby creating a silencer. Additionally, the threaded end of the Silencer Adapter fit into the threaded section of Silencer 1 and Silencer 2.

32. On November 18, 2021, ATF Special Agent Josiah Fenceroy was advised by ATF Firearms and Ammunition Technology Division (FATD), Firearms Technology Criminal Branch (FTCB), Firearms Enforcement Officer (FEO) Ronald Davis, that he examined the two suspected silencers (Silencer 1 and Silencer 2) and verbally stated they meet the definitions of "firearm" under Title 26, United States Code, Section 5845(a), and Title 18, United States Code, Section 921(a)(3); the definition of "silencer" under Title 26, United States Code, Section 5845(a)(7); and the definitions of "firearm silencer" and "firearm muffler" under Title 18, United States Code, Section 921(a)(24).

33. On November 18, 2021, and November 19, 2021, ATF Special Agent Fenceroy, using ATF Tucson Industry Operations resources, conducted a query for MORENO in the ATF National Firearms Registration and Transfer Record (NFRTR) and ATF Federal Licensing System (FLS) database. The query was negative, revealing that MORENO does not have any National Firearms Act (NFA) firearms registered to him in the NFRTR, nor is he a member of any trust with NFA firearms registered in the NFRTR, and finally does not have a Federal Firearms License (FFL) to receive, buy or sell firearms.

34. On November 22, 2021, ATF SA Fenceroy received the ATF FTCB Report of Technical Examination of Silencer 1 and Silencer 2 completed by ATF FATD, FTCB, FEO Ronald Davis. FEO Davis concludes in his report that Exhibit 1 (Silencer 1), being a device for silencing, muffling, or diminishing the report of a portable firearm, is a "firearm silencer" as defined in 18 U.S.C. § 921(a)(24). Exhibit 2 (Silencer 2), being a combination of parts designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or muffler, is a "firearm silencer" as defined in 18 U.S.C. § 921(a)(24). Exhibits 1 and 2, each being a firearm silencer, are each also a "firearm" as defined in 18 U.S.C. § 921(a)(3)(C) and 26 U.S.C. § 5845(a)(7).

Furthermore, Exhibits 1 and 2 bear no NFA manufacturer's marks of identification or serial numbers as required by 26 U.S.C. § 5842.

35. In my training, experience, and consultation with other agents who are familiar with silencer cases, I know that individuals who purchase firearm silencers typically do so only if they possess a firearm to which they intend to attach the silencer. Furthermore, MORENO has demonstrated on multiple occasions that he continues to possess and carry firearms and has modified firearms for sale. Based on MORENO's history and the purchase of the silencers, I believe MORENO is likely to possess a firearm at the Target Address.

36. I know that cellular telephones, computers, tablets, and other similar electronic devices can be utilized to access internet websites to order illegal contraband including "Spiral Single Core," or firearm silencers, that MORENO ordered. MORENO used the telephone number of "5510729" when ordering the two silencers. As previously discussed herein, this telephone number, with the "520" area code, is associated to MORENO.

37. I know that electronic devices, such as cellular telephones, computers, and other electronic storage media can store information for long periods of time. This information can sometimes be recovered with forensics tools. Additionally, I know that most cellular telephones have the capability to access the internet and therefore can be used by individuals to access their email accounts, which may be used as the email address on file with a company they do business with and have correspondence with regarding the tracking of their package or merchandise. Furthermore, I know cellular telephones, computers or similar devices may include browsing history that may show the websites utilized to purchase illegal contraband.

38. I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet.

Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.

40. Based on my knowledge, training and experience, and experience of other law enforcement officers and agents, individuals commonly have evidence of their illegal firearm and/or silencer purchases on their cellular telephones. These devices are often located on the person or in their residence or vehicle.

40. I have reviewed vehicle registration records for MORENO, which show he currently does not have any vehicles registered in his name. Police reports show MORENO has a history of using vehicles registered to his mother, Jacque Antar. As discussed in paragraph 23, I have observed Antar's white Nissan Titan pickup truck at the Target Address. Additionally, on November 30, 2021, I observed a gray Toyota Camry, registered to Kendal Varelas, parked under the carport of the Target Address. MORENO was arrested at Varelas' residence in 2016 while TPD was executing an arrest warrant for Varelas. Due to the fact that no vehicles are registered to MORENO, and my observation of these vehicles at the Target Address, I believe MORENO is likely using a vehicle registered to another individual. This application therefore requests permission to search vehicles registered to Varelas, Antar, or any other individual which are parked at the Target Address during the execution of the requested warrant.

41. During my surveillance of the residence, I have been unable to see into the back yard to confirm the presence of any attached or unattached outbuildings or sheds. However, an assessor's sketch of the Target Address shows an attached storage room outside of the residence at the south end of the driveway and carport. This application therefore requests permission to search any attached or unattached outbuildings, sheds, storage rooms, storage lockers, and trash containers at

the Target Residence that could contain firearms, or any other evidence of the offenses identified herein.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

42. As described above and in Attachment B hereto, this application seeks permission to search the aforementioned premises, persons, and vehicles for records and/or information related to the commission of the offenses of smuggling goods into the United States, possession of National Firearms Act (NFA) firearms not registered in the National Firearms Registration and Transfer Records (NFRTR) and possession of a firearm by a convicted felon, by Eric Lawrence MORENO, in whatever form the records are found. One form in which the records might be found is data stored on computers, cellular telephones, and/or other electronic storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

43. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), electronic storage media can contain other forms of electronic evidence as well:

> a. Forensic evidence on a computer, cellular telephone, or storage medium can also indicate who has used or controlled the computer, cellular telephone, or storage medium. This user attribution evidence is analogous to the search for indicia of occupancy while executing a search warrant at a residence. For example, registry information, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, electronically-stored photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who

used or controlled the computer, cellular telephone or storage medium at a relevant time.

b. A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a cellular telephone, or other electronic device is evidence may depend on other information stored on the electronic device and the application of knowledge about how that device behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

44. I know that when an individual uses an electronic device pertaining to the purchase of silencers online, the individual's device may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain data that is evidence of how the electronic device was used, data that was sent or received, notes as to how the criminal

conduct was achieved; records of internet discussions about the crime, and other records that indicate the nature of the offense.

## SEARCH METHODOLOGY TO BE EMPLOYED

45. It would be extremely difficult, if not impossible, to conduct a thorough on-site review of all the potential evidence in this case. Given these constraints, the search methodology to be employed as to computers, cellular telephones and other electronic storage media is as follows:

> a. All computers, cellular telephones, and any form of electronic storage that could contain evidence described in the attachment of this warrant will be seized for an off-site search for evidence that is described in the attachment of this warrant. The examination may require authorities to employ techniques, including computer-assisted scans of the entire medium, that might expose many parts of the items to human inspection in order to determine whether it is evidence described by the warrant. It is anticipated that mirror copies or images of such evidence will be made if the failure to do so could otherwise potentially alter the original evidence.
>
> b. Consistent with the information provided within this affidavit, contextual information necessary to understand the evidence, to identify the user/possessor of the electronic devices, and to establish admissibility of the evidence in subsequent legal proceedings will also be sought by investigative agents.
>
> c. Additional techniques to be employed in analyzing the seized items will include (1) surveying various file directories and the individual files they contain, (2) opening files to determine their contents, (3) scanning storage areas, (4) performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence

described in this affidavit and its attachments, and (5) performing any other data analysis techniques that may be necessary to locate and retrieve the evidence in this affidavit and its attachments.

d. Because it is expected that the computers, cellular telephones and any form of electronic storage media may constitute (1) instrumentalities of the offense, (2) fruits of criminal activity, (3) contraband, (4) evidence otherwise unlawfully possessed, or or (5) evidence of the person who committed the offense and under what circumstances, it is anticipated that such evidence will not be returned to the owner and that it will be either forfeited or ultimately destroyed in accordance with the law at the conclusion of this case. However, if after careful inspection, investigators determine such computer, cellular telephone/or, and electronic storage media do not contain (1) instrumentalities of the offense, (2) fruits of criminal activity, (3) contraband, (4) evidence otherwise unlawfully possessed, or (5) evidence of the person who committed the offense and under what circumstances, the offense was committed, then such items seized will be returned.

## CONCLUSION

46. Based on the foregoing, there is probable cause to believe there is evidence of crimes in violation of 18 U.S.C. § 545, smuggling goods into the United States; 26 U.S.C. § 5861(d), possession of unregistered NFA firearms not registered in the NFRTR; and 18 U.S.C. § 922(g)(1), possession of a firearm by a convicted felon, which will be found at the Target Address, including any vehicles and/or outbuildings on the premises, the person of MORENO, and any electronic

storage media in the premises, vehicles, or outbuildings, or on MORENO's person. I therefore respectfully request that this Court issue a warrant authorizing the search of the Target Address and person of MORENO, more specifically described in Attachment A, and the seizure of the items specifically described in Attachment B.

Respectfully submitted this _____ day of December 2021.

_____
PAUL V BRADLEY
Digitally signed by PAUL V BRADLEY
Date: 2021.12.03 16:10:22 -07'00'

Paul Bradley, Special Agent
Homeland Security Investigations

Sworn and subscribed to me telephonically this __3rd__ day of December 2021.

_____
Honorable Bruce G. Macdonald
UNITED STATES MAGISTRATE JUDGE